Filed 10/16/25  In re A.H. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | C103466 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>N.D. et al.,<br><br>        Objectors and Appellants. | (Super. Ct. No. JV202429) |

Natalie D. (mother) and Connor H. (father) appeal from a juvenile court order terminating their parental rights.  They do not challenge the court's substantive findings but contend that insufficient evidence supports the court's finding that the Indian Child Welfare Act (ICWA) does not apply in this case.  We conclude substantial evidence supports the juvenile court's finding and will affirm the order.

1

BACKGROUND

A.H. was born to mother and father in 2024.  Shortly thereafter, the Yolo County Health and Human Services Agency (Agency) filed a petition pursuant to Welfare and Institutions Code section 300[1] seeking to assert dependency jurisdiction over A.H., alleging she was at risk of harm as a result of her parents' substance abuse.

Prior to the detention hearing, father told a social worker that his mother's family had ancestry from an unspecified Cherokee tribe.  At the outset of the detention hearing, the juvenile court informed the parties that ICWA required it to conduct an inquiry into A.H.'s heritage.  A.H.'s maternal grandmother told the court that she was unaware of any Indian heritage in her family but reported that the maternal grandfather said he had some Indian heritage, although subsequent DNA testing did not show any.  Father reported that he had "possible Cherokee ancestry through his grandmother's side, but he d[id]n't really have much more information other than that."  The court asked the parties to provide contact information for relatives who might know about any Indian heritage.

Prior to the jurisdiction and disposition hearing, a social worker from the Agency spoke with father's sister, who reported no known Indian ancestry in father's family.  She also reported that she and father had no contact with their father or father's mother and that their grandmother had died the previous year.

At the jurisdiction and disposition hearing, the juvenile court again asked A.H.'s maternal grandmother whether anyone in her family had Indian heritage.  She replied that "family lore" held that a maternal great-grandmother "believed that she was from the Blackfeet Tribe in Michigan," but that relative was now deceased and the family had no way to verify the information.  The maternal grandmother also reported that no living relatives had any additional information about the connection to the "Blackfeet Tribe."

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

The juvenile court also asked father's sister about Indian heritage, and she stated that A.H.'s paternal great-grandmother was "Blackfoot Cherokee." She then corrected herself and stated that A.H.'s paternal great-great-great grandmother "was a hundred percent Blackfoot Cherokee." Father then corrected his sister and said that the relative was "[j]ust Cherokee." Father's sister indicated that they knew the relative's first name but did not know a last name. Father's sister did not know anyone who was more knowledgeable about this relative. The court told her to let father's attorney and the social worker know if she thought of anyone else or had any more information.

Following the hearing, mother filed an ICWA-020 parental notification of Indian status form indicating that her grandmother and her great-grandmother were members of a federally recognized tribe called "Blackfoot" located in Michigan. A social worker from the Agency then interviewed A.H.'s maternal grandmother, who explained that her husband's mother had been adopted as a child. As an adult, she had found her biological mother, who "was supposedly part of the Blackfeet Tribe from Michigan but there was never any record of membership or residing on tribal land." The maternal grandmother stated that both of those relatives were deceased, her husband could not be interviewed because he suffered from dementia, and his father was deceased.

The Agency interviewed mother and father, and both stated that neither they nor A.H., nor any other relatives were members of an Indian tribe, had known Native American ancestry, or had ever lived on an Indian reservation. When asked if he knew anyone who would have more information, father said no and then stated that his maternal great-grandmother "was full blooded Cherokee but she was adopted by a white family." Mother also responded that she did not know anyone who would have more information and then stated that "she is Blackfoot and it comes from her dad's side."

The Agency interviewed father's mother, who said she did not have any Indian heritage, but she did not know about father's father. Father's mother stated that she did not know anyone who would have more information, her mother was deceased, and her

3

father was still alive but she did not have contact information for him. The Agency also interviewed one of mother's aunts, who said she did not know of any Indian heritage but provided contact information for some of mother's cousins. The Agency interviewed one of father's aunts, who said she did not know of any Indian ancestry. At one point, she thought her grandmother was a member of a Cherokee tribe in Oklahoma, but they found no record of her in tribal registries. The Agency also interviewed one of father's uncles, who did not know of any Indian ancestry. The Agency contacted another of mother's aunts and an uncle and left voicemail messages, but they did not respond.

The Agency sent notices to the Bureau of Indian Affairs, the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana,[2] and the three federally recognized Cherokee tribes—the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma. The notices included A.H.'s identifying information along with the names, relationships, and known details for her relatives. All four tribes eventually responded, with each stating that, based on the information provided, A.H. was not an Indian child under ICWA with respect to that tribe.

At the section 366.26 permanency planning hearing, the Agency asked the juvenile court to find that A.H. is not an Indian child and that ICWA does not apply. The court reviewed and admitted into evidence the Agency's report detailing its inquiry into whether A.H. qualified as an Indian child under ICWA and found that A.H. was not an Indian child under ICWA. The court then terminated mother's and father's parental rights.

---

[2] Although mother and the maternal grandmother suggested the tribe was located in Michigan, the only similarly named federally recognized tribal entity is the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. (89 Fed.Reg. 99899 (Dec. 11, 2024); see 25 U.S.C. § 5131; 25 C.F.R. § 83.6(a) (2025).)

Mother and father filed timely notices of appeal from the order terminating their parental rights.

DISCUSSION

On appeal, mother and father contend the juvenile court's finding that ICWA does not apply is not supported by substantial evidence. They argue that the finding cannot stand because the Agency failed to include letters from the Cherokee Nation and the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana, and failed to include return receipts showing that it contacted these tribes—though father acknowledges that a return receipt is included for a mailing to the Cherokee Nation. We conclude substantial evidence supports the juvenile court's finding.

The "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*); 25 U.S.C. § 1921; 25 C.F.R. § 23.106 (2024).) "The issue of whether ICWA applies in dependency proceedings turns on whether the minor is an Indian child. An 'Indian child' is defined as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).) At the commencement of a child custody proceeding, the court is obligated to inquire from each participant whether there is a 'reason to know' that the child is or may be an Indian child. (25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(a) (2024).)" (*Dezi C.*, at pp. 1129-1130, fn. omitted.)

Under California's implementing provisions, "[a]gencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).)" (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132.) "When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e); see also rule

5

5.481(a)(4).)  The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe.  (§ 224.2, subd. (e)(2)(A)-(C).)  At this stage, contact with a tribe 'shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices,' and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.'  (*Id.*, subd. (e)(2)(C).)"  (*Dezi C.*, at pp. 1132-1133, fn. omitted.)  "If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes.  (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).)"  (*Dezi C.*, at p. 1133.)

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.'  (§ 224.2, subd. (i)(2).)"  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.)[3]  The substantial evidence test " 'requires us to determine if reasonable, credible evidence of solid value supports the court's order.' "  (*D.S. v. Superior Court* (2023) 88 Cal.App.5th 383, 390.)

---

[3]  As our Supreme Court has noted, some appellate courts have "used a hybrid standard, reviewing for substantial evidence whether there is reason to know a minor is an Indian child, and reviewing a finding of due diligence and proper inquiry for abuse of discretion." (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101; see *Dezi C.*, *supra*, 16 Cal.5th at p. 1141 ["the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' "].) Here, mother and father have argued only that the juvenile court's finding is not supported by substantial evidence, so we need not determine whether an abuse of discretion standard applies or whether the court abused its discretion. In any event, where " 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)

Here, substantial evidence shows that A.H. is not an Indian child under ICWA. The Agency interviewed and contacted numerous extended family members, most of whom knew of no Indian ancestry and none of whom offered anything more than "family lore" suggesting a distant ancestor had Indian ancestry. Arguably, nothing discovered in this inquiry gave the juvenile court a "reason to believe" A.H. was an Indian child, that is, she "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).)

Nevertheless, the Agency proceeded as if it had reason to believe A.H. was an Indian child by sending notices to the Bureau of Indian Affairs, the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana, the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma. All four of the contacted tribes stated that, based on the information provided, A.H. was not an Indian child under ICWA with respect to the tribe. The juvenile court admitted the Agency's report about these communications without objection. This is substantial evidence supporting the court's finding that A.H. is not an Indian child.

Mother and father assert that "the evidence remained unclear regarding whether [A.H.] was eligible for enrollment in the Cherokee Nation or Blackfeet [Tribe of the Blackfeet Indian Reservation of Montana], as the record does not contain letter[s] from these tribes nor certified rec[e]ipts confirming further inquiry." Father elaborates that section 224.3 requires that "[p]roof of the notice, including copies of notices sent and all return receipts and responses received, shall be filed with the court in advance of the hearing." But the provision requiring the filing of these documents only applies "[i]f the court, a social worker, or probation officer knows or has reason to know, as described in subdivision (d) of Section 224.2, that an Indian child is involved" in the proceedings. (§ 224.3, subd. (a).) As our Supreme Court has explained, "The sharing of information with tribes at th[e] inquiry stage is distinct from formal ICWA notice, which requires a

7

'reason to know'—rather than a 'reason to believe'—that the child is an Indian child."
(*Dezi C.*, *supra*, 16 Cal.5th at p. 1133.)  If, on the other hand, the Agency's inquiry does
not supply a "reason to know" the child is an Indian child, a juvenile court may find that
ICWA does not apply.  (*Id.* at p. 1134.)

"There is reason to know a child involved in a proceeding is an Indian child under
any of the following circumstances:  [¶]  (1) A person having an interest in the child,
including the child, an officer of the court, a tribe, an Indian organization, a public or
private agency, or a member of the child's extended family informs the court that the
child is an Indian child.  [¶]  (2) The residence or domicile of the child, the child's
parents, or Indian custodian is on a reservation or in an Alaska Native village, as defined
in subdivision (c) of Section 1602 of Title 43 of the United State Code.  [¶]  (3) Any
participant in the proceeding, officer of the court, Indian tribe, Indian organization, or
agency informs the court that it has discovered information indicating that the child is an
Indian child.  [¶]  (4) The child who is the subject of the proceeding gives the court
reason to know that the child is an Indian child.  [¶]  (5) The court is informed that the
child is or has been a ward of a tribal court.  [¶]  (6) The court is informed that either
parent or the child possess an identification card indicating membership or citizenship in
an Indian tribe."  (§ 224.2, subd. (d).)

None of these circumstances are present in this case.  Accordingly, the Agency
had no duty to file copies of the tribes' responses or return receipts in the juvenile court.
The Agency's testimony about its efforts and the result of its inquiry is " 'reasonable,
credible evidence of solid value [that] supports the court's order.' "  (*D.S. v. Superior
Court*, *supra*, 88 Cal.App.5th at p. 390.)

## DISPOSITION

The order terminating mother's and father's parental rights is affirmed.


                                                                            _____/s/_____
                                                                            BOULWARE EURIE, J.


We concur:


_____/s/_____
HULL, Acting P. J.


_____/s/_____
ROBIE, J.